UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.          ) | C.A. No. 07-0109 S |
| ) | |
| JONATHAN CAMPBELL     ) | |

### DECISION AND ORDER

William E. Smith, United States District Judge.

Before the Court are motions to suppress evidence and statements arising out of Defendant's arrest for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Following written submissions, the Court held an evidentiary hearing that spanned approximately four half days, at the conclusion of which counsel submitted additional briefing. For the reasons set forth below, both motions are DENIED.[1]

I.   Findings of Fact

On May 3, 2007 at approximately 9:00 p.m., Providence Police Officers Jonathan Primiano and Leonel Pichs patrolled the Chad Brown Housing Development in a marked police car as part of the gun task force unit. At some point, Primiano and Pichs exited the car

---

[1] Defendant also moved for Disclosure of the Identity of the Informant or Informants (#25). The evidence thus far indicates the officers involved never obtained and do not know the informant's name. In any event, Defendant cannot meet his heavy burden to show he is entitled to the name of an informant who, on the current record, had no involvement in the criminal activity and, according to the Government, will not be called at trial. The motion is denied. See United States v. Gomez-Genao, 267 F.3d 1, 2-3 (1st Cir. 2001).

and spoke with a group of individuals after Primiano recognized one man from prior criminal activity.  A different man in the group approached Primiano and said he had information.  Primiano had seen the man before, but had not met him personally and did not recall whether he asked for his name.  He advised Primiano that a black Chevy Tahoe with Massachusetts license plates would be coming into the Charles Street area of Providence from Massachusetts that evening.  He said the Tahoe would be occupied by two black males, both of whom this individual knew to have prior weapons charges, and that they would have a firearm.

The officers set up watch from a parking lot with a view of the Charles Street exit off of Route 95 south, less than a quarter mile from the Chad Brown Development.[2]  Around 10:00 p.m., they observed a black Chevy Tahoe with Massachusetts license plates with two black males exit onto Charles Street off of Route 95 south. After pulling out behind the Tahoe, the officers observed it change lanes without a turn signal.  Primiano activated the emergency lights and siren and pulled the Tahoe over, just past a strip club in what Primiano described as a high crime area.  The police car had a spotlight, and both officers testified that despite the Tahoe's tinted windows they could view its interior.  Both officers approached on foot and shined flashlights into the Tahoe.  They observed Defendant in the driver's seat appear to be tampering or

---

[2] Both officers said they routinely follow up on tips.

2

fidgeting with the center console.  Primiano said "he's stuffing," and Pichs, approaching from the passenger side, indicated the same. Defendant and the front passenger were ordered to show their hands. Neither complied at first but did so upon repeated instructions.

Pichs asked the passenger to exit the car and performed a pat down search.  Primiano asked Defendant to do the same and he complied.[3]  While patting down Defendant, Primiano asked whether "there were any weapons, drugs, anything I needed to know about in the vehicle?"  Defendant said there may be a BB gun his nephew left in the car, and that Primiano could "check."  Primiano walked Defendant to the rear of the Tahoe, where Pichs arrived with the passenger.  Primiano asked both to "have a seat on the curb" and advised Pichs that Defendant consented to a search.

Pichs went to the driver's side, lifted the bottom tray of the center console that was slightly ajar, and saw the butt of a handgun protruding out of a white sock.  He advised Primiano that he had located a handgun, and Defendant and his passenger were handcuffed.  The Rhode Island Bureau of Criminal Identification (BCI) was notified and an officer arrived and took photographs. Upon further search, a BB gun was located underneath the passenger seat.  According to Primiano, the entire encounter from when the officers pulled the Tahoe over until Pichs located the handgun

---

[3] Defendant does not challenge the order to exit the Tahoe. See Pennsylvania v. Mimms, 434 U.S. 106, 109-111 (1977); Maryland v. Wilson, 519 U.S. 408, 415 (1997).

lasted two or three minutes.  Pichs said it was less than five
minutes.  Defendant was arrested and charged with being a felon in
possession of a firearm.[4]

After being transported to the Providence Police Station,
Defendant met with Officer Thomas Zincone, a 14-year member of the
Department and part of the gun task force.  Primiano had called
Zincone following the stop and arrest to ask for assistance in a
firearms investigation.  At the station, Primiano asked Zincone if
he could take a statement from Defendant.[5]  Zincone agreed and met
with Defendant in the interrogation room.  According to Zincone, it
was procedure to handcuff a suspect's arm to a bar on the wall, and
he believed he did so that evening.

Zincone testified that Defendant was nervous but talkative.
Following some "small talk" Zincone presented a Miranda warnings
form after Defendant said he wanted to cooperate.  Zincone wrote
Defendant's name and charge (possessing a firearm) at the top,
marked an "X" next to each of six numbered warnings, "slid the
rights form over to [Defendant]," and "asked him if he could read
one through six and then after he read it if he could put his
initials."  Defendant took the form, appeared to read through it
(said Zincone), and initialed it.  Zincone asked if he understood

---

[4] Defendant was later issued a traffic violation ticket.

[5] No evidence was presented as to why Primiano did not take
the statement himself.

4

his rights; Defendant said yes.  Zincone marked an "X" next to "I UNDERSTAND MY RIGHTS" on the form and recorded the date.  Defendant signed his name and wrote a Massachusetts address.

Zincone then presented a blank written statement form and wrote down personal information he obtained verbally from Defendant such as date of birth.  He asked Defendant whether he was willing to give a statement and Defendant said yes.  The time listed was 1:30 a.m.  Zincone handed the form to Defendant, who said he wanted Zincone to write his statement out because he was nervous.  Zincone began by asking why he was at the station, and as Defendant spoke Zincone wrote the following statement:

> I got a phone call from a friend named "Will" from "RI" said he has problems with "Doods."  He said bring one of them "things" meaning a gun.[6]  I told Will I would meet him on Charles St.  I got pulled over on Charles St.  The cops found a BB Gun (Replica) Handgun in the back seat.  The cops informed me they found another gun in center console.  The gun the police found is a chrome .38 revolver with 5 rounds.  The gun is mine, but I didn't know it was in the car.  I got it 4 months ago from North Carolina.  I paid (300.00) for the gun.

After Defendant was finished speaking, Zincone handed him the form and asked him to read and sign it.  Zincone testified that Defendant took a "couple of minutes" to do so, but acknowledged on cross-examination that he did not know if Defendant actually read the statement or, for that matter, the Miranda warnings on the first form.  During this time Defendant appeared "normal" and used

---

[6] Zincone said he used quotes for words he deemed especially relevant or important.

a usual tone of voice.  Zincone testified he had no inclination Defendant did not understand what was happening.  The exchange was not recorded.[7]

## II.  Discussion

Defendant makes three requests.  First, he seeks suppression of the gun found in the center console, because the testimony regarding the tip and lane change violation is not credible and cannot provide grounds for reasonable suspicion for the stop. Second, he seeks suppression of his statement that Primiano could "check" the Tahoe, because his will was overborne by various circumstances (low IQ, minimal education, illiteracy, anxiety, etc.) such that he could not have voluntarily consented.  Third, he asks the Court to suppress his statement at the station to Zincone, because the same combination of personal circumstances kept him from understanding and waiving his Miranda rights.

### A.   The Stop of the Tahoe

Defendant first claims he was the victim of an illegal search and seizure because officers did not have grounds to pull him over without a warrant; thus, the gun should be excluded.  Primiano and

---

[7] The Court is encouraged by Zincone's testimony that the Providence Police Department now records such interrogations as a matter of policy.  See Motion to Suppress Transcript, 29:17, Dec. 19, 2008 ("we now take tape recorded statements").  However, the Court has never been informed of this policy change, and indeed information to the contrary has appeared in the public media.  See Katie Mulvaney, Police resist judge's call that they record interrogations, Providence Journal-Bulletin, Mar. 18, 2009, at 1.

Pichs, says the Defendant, should not be believed because the chain of events with the tipster and traffic violation is simply too good to be true.

It is well-settled that a traffic stop may be constitutional if based upon probable cause to believe a traffic violation has occurred, <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996), or if based upon reasonable and articulable suspicion that "criminal activity may be afoot" under <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). <u>See also</u> <u>United States v. Romain</u>, 393 F.3d 63, 71 (1st Cir. 2004). The Government must prove such a stop was justified. <u>United States v. Monteiro</u>, 447 F.3d 39, 43 (1st Cir. 2006); <u>see also</u> <u>United States v. Brown</u>, 500 F.3d 48, 54 (1st Cir. 2007) (the constitutionality of a stop is evaluated through a "broad-based consideration of all the attendant circumstances").

The record provides no basis to doubt that Primiano and Pichs observed the Tahoe change lanes without signaling after exiting Route 95. Defendant deems this an "unrealistically quick traffic violation" because it occurred within approximately twenty seconds of when the officers first saw him. But there is nothing inherently unbelievable about this chain of events, the testimony is uncontradicted, and there is no other reason to doubt the officers given their consistent testimony. The fact that Pichs said he would have pulled Defendant over regardless of the lane change (in other words, that the violation may have been a pretext)

does not make an otherwise valid stop unconstitutional. <u>Whren</u>, 517
U.S. at 813 ("Subjective intentions play no role in ordinary,
probable-cause Fourth Amendment analysis."); <u>United States v.
Thomas</u>, 93 F.3d 479, 485 (8th Cir. 1996) ("so long as police have
probable cause to believe that a traffic violation has occurred,
the stop is valid even if the police would have ignored the traffic
violation but for their suspicion that greater crimes are afoot").
Accordingly, the lawful traffic stop disposes of Defendant's
argument that the gun is fruit of the poisonous tree.

Defendant's next contention is that the evidence about the
tipster is "wholly improbable" and cannot justify the stop. The
Court briefly touches on this argument though it need not resolve
it given the lawful traffic stop. The gist is that it strains
credulity to believe officers would have randomly approached a
group in the housing project, been given a detailed tip by someone
not previously known to be a source, and that officers would not
try to learn his name or connection to Defendant. It is true that
exclusive use of informant tips warrants close attention and may
not justify an investigatory stop absent adequate indicia of
reliability. <u>See Alabama v. White</u>, 496 U.S. 325, 332 (1990);
<u>Brown</u>, 500 F.3d at 54-55. There is no magic formula for this
determination, and absent the lane-change violation closer scrutiny
of these facts would certainly be in order. In any event, while
Primiano and Pichs knew little about the tipster, the detailed

character (time, type of car, location, and occupants) and timely corroboration of the tip following an in-person conversation arguably would offer sufficient reliability.[8]

B.    Consent to Search

Having deemed the initial stop proper, the Court turns to the search that uncovered the handgun.  A search conducted pursuant to valid consent is an established exception to the requirement that police have a warrant.  Schneckloth v. Bustamonte, 412 U.S. 218, 219, 225 (1973) (consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker").

Mindful again of the Government's burden, the evidence supports finding valid consent.  Primiano casually asked if there was anything he should know about in the Tahoe within seconds of speaking with Defendant, and his statement "you can check" as the driver would reasonably encompass the center console.  United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003) (scope of consent measured by objective view of what a reasonable person would have understood by the exchange between the officer and subject).  Moreover, while there is little doubt the traffic stop

---

[8] Defendant in passing avers that the true story is this: officers received information from a different, undisclosed source and/or that Defendant (or the tipster) participated in phone calls that evening that are somehow relevant.  There is no simply evidence to this effect.  As to whether the Government has declined to inquire into a potential witness (or say whether it received information from him or her), suffice it to say both parties are aware of their pretrial disclosure obligations and the Court, as always, expects full compliance.

was by its nature a stressful situation, as discussed more fully below with respect to Defendant's later statement, the Government offered sufficient proof to rebut the notion that Defendant was vulnerable and acted against his will due to mental incompetence and anxiety when responding verbally to Primiano's question. Without any evidence of coercion, force, or trickery, it simply cannot be said that Defendant's consent was involuntary.[9]

A final note on consent. It is worth pointing out that even if Defendant's consent was invalid, the search of the console in all likelihood would qualify as a protective Terry search. This is especially so given the observations of "fiddling" with the console, combined with the delayed show of hands and tip that a weapon would be in the car and that the occupants had criminal histories. See Michigan v. Long, 463 U.S. 1032, 1049, 1051-52 (1983); United States v. Diaz, 519 F.3d 56, 61-63 (1st Cir. 2008);

_____

[9] In his pre-hearing memorandum, Defendant suggested his consent was invalid due to lack of Miranda warnings. Miranda v. Arizona, 384 U.S. 436 (1966). There was no formal arrest at the time, so the question becomes whether the situation amounted to a "de facto" arrest triggering Miranda. Given the quick, non-threatening and limited nature of this initial exchange, the Court is comfortable that Defendant's consent was not the result of custodial interrogation. See Berkemer v. McCarty, 468 U.S. 420, 437-40 (1984) (Miranda warnings not required for person questioned during routine traffic stop in non-coercive setting); United States v. Teemer, 394 F.3d 59, 65-66 (1st Cir. 2005) (no de facto arrest even though reasonable person in defendant's position would "not have thought himself free to walk away"); United States v. Jones, 187 F.3d 210, 217-18 (1st Cir. 1999) (no interrogation during highway stop when one officer briefly questioned suspect in a normal tone of voice after requiring suspect to exit the car).

<u>United States v. Stanley</u>, 915 F.2d 54, 56 (1st Cir. 1990) (nervous movements and apparent attempt to conceal something supported reasonable suspicion).

    C.    Statement/Events at Police Station

Defendant's final contention is that he did not waive his <u>Miranda</u> rights at the station and could not have provided Zincone a knowing, voluntary and intelligent statement. After extensive review of the record and careful consideration of the testimony and report of Defendant's expert psychologist Dr. John D. Parsons, the Court is persuaded that suppression of his statement is not warranted.

The Fifth Amendment guarantees "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V.  A suspect may waive this privilege so long as the waiver is voluntary and knowing. <u>Miranda</u>, 384 U.S. at 444; <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  Waiver is voluntary when "it [is] the product of a free and deliberate choice rather than intimidation, coercion, or deception"; it is knowing and intelligent when "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>United States v. Bezanson-Perkins</u>, 390 F.3d 34, 39 (1st Cir. 2004) (quoting <u>Moran</u>, 475 U.S. at 421).  "Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension

may a court properly conclude that the <u>Miranda</u> rights have been waived." <u>Moran</u>, 475 U.S. at 421 (internal quotations and citation omitted); <u>see also</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986). There is no dispute Defendant was subject to custodial interrogation at the station, and that Zincone administered <u>Miranda</u> warnings via the right form. The issue is whether Defendant understood the warnings and, if so, whether he knowingly and voluntarily waived his rights.

There is no hard and fast rule as to when someone with limited cognitive functioning can knowingly and intelligently waive <u>Miranda</u> rights. Such personal traits are a relevant piece of the overall inquiry into the totality of circumstances. <u>See</u> <u>United States v. Rojas-Tapia</u>, 446 F.3d 1, 7-8 (1st Cir. 2006) (waiver inquiry turns on characteristics of the accused and details of interrogation). "A defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness." <u>Id.</u> at 7; <u>see also</u> <u>Connelly</u>, 479 U.S. at 167 (some "coercive police activity" is usually a necessary predicate for an involuntary confession). The Court examines a myriad of factors including a defendant's cognitive ability, prior experience with the criminal system, evidence of police trickery or coercion or undue pressure, lack of water or sleep or food, evidence of a language barrier, a defendant's own words, the length of the interrogation, whether

12

weapons were drawn, the number of officers present, and a defendant's demeanor and ability to articulate as described by law enforcement and others.  See Rojas-Tapia, 446 F.3d at 4, 7-9 (collecting and discussing cases).

Here, the Government met its burden.  Defendant does not argue -- and there is no evidence -- Zincone used intimidation or coercion to elicit a confession.  Defendant was asked whether he wished to provide a statement.  No weapons were used.  A single officer questioned Defendant approximately three hours after the arrest and the exchange was not prolonged.  There was no language barrier.  Defendant did not request an attorney nor suggest he did not wish to speak to police.  Nothing in the record even hints at misleading tactics or manipulation by Zincone, who used a standard department Miranda rights form and statement form.  There is no allegation of deprivation of sleep, food or drink.  At this stage of analysis, this was a routine post-arrest interview of a suspect who expressed willingness to cooperate.  United States v. Duarte, 160 F.3d 80, 81-82 (1st Cir. 1998).

With that backdrop, the Court moves to the individual characteristics of the Defendant.  Defendant points to testimony from Dr. Parsons, a psychologist who submitted a report after twice meeting with Defendant in May of 2008 to perform a psychological evaluation of his social, emotional and cognitive functioning.  Dr. Parsons performed a series of psychological tests such as the

13

Wechsler Adult Intelligence Scale, and conducted a clinical interview and personality/anxiety/depression inventory. Defendant is a thirty-seven year old male with three adult children (with whom he has had limited or no contact). He has a Massachusetts drivers license and, according to Dr. Parsons, manages his own finances and has been married twice. He quit school at age 16 after being a special education student and did not earn a GED. Defendant has held at least six jobs, including at fast food establishments and with a moving company. He was arrested as a juvenile and spent time in a correctional facility; as an adult, he has been arrested over twenty times and been in and out of incarceration for approximately twenty years.

Dr. Parsons opined that Defendant is mildly mentally retarded, suffers from bipolar disorder, anxiety and depression, has severe emotional problems (including hysterical crying), and is functionally illiterate and reads at approximately a third grade level.[10] He also has a collection of physical health issues such as chronic back pain, hypertension, respiratory and gastrointestinal problems, and a life-threatening illness. According to Dr. Parsons, Defendant's "emotional problems also interfere with the efficiency of his cognitive functioning. The

---

[10] The Government introduced testimony of a Wyatt Detention Facility employee who met with Defendant in 2007 to complete a detainee intake assessment form. She said Defendant responded "yes" when asked whether he could read and write in English.

combination of these factors would have negatively impacted Mr. Campbell's ability to provide a valid and coherent statement at the time of his arrest."  Dr. Parsons believes Defendant was likely "extremely upset" after being stopped by police, and later at the station there was a "good chance that he would have certainly had difficulty in responding to and providing a valid and coherent statement."

Defendant's physical, mental and emotional health issues are not insignificant -- but they fail to render his waiver and subsequent statement involuntary or unknowing.  First off, there can be no doubt Defendant understood <u>Miranda</u> and what he agreed to by initialing the rights form, responding "yes" when Zincone asked if he understood his rights, and signing his name.  Indeed, Dr. Parsons admits Defendant "is aware of his Miranda rights, <u>whether he can read them or not</u> . . . he knows, for example, he has a right to remain silent and et cetera." (emphasis added).  Defendant's extensive experience with the criminal justice system (including specific testimony about receipt of <u>Miranda</u> rights from a police officer in 2005) closes the door on the notion that he was unfamiliar with <u>Miranda</u>.  <u>See Henyard v. McDonough</u>, 459 F.3d 1217, 1241 (11th Cir. 2006) (considering prior experience with the justice system in finding knowing waiver).

Even if he understood <u>Miranda</u>, Defendant argues that his anxiety and depression were elevated when speaking with Zincone

(and in responding to Primiano's question outside of the Tahoe),
thus preventing voluntary communication with police. Whatever the
possibility Defendant was vulnerable or confused or affected by his
ailments, the evidence as to what occurred in May 2007 suggests
otherwise. Defendant says Zincone and Primiano should have been
aware of his mental deficiency. But both testified credibly that
Defendant was coherent and articulate, and this Court sees no basis
to question the officers' veracity. Defendant said he wished to
cooperate early in the exchange and again when offered the blank
statement form. He gave no indication he could not read or
understand spoken English.[11] The date of birth he provided Zincone
is the same as listed in Dr. Parsons' report. He was not
intoxicated. It would be pure speculation to find Zincone
recognized Defendant's discomfort or "preyed upon his alleged
intellectual deficiencies." Rojas-Tapia, 446 F.3d at 8. Though
Defendant's counsel insinuated otherwise during cross-examination,
Zincone's written paragraph in no way suggests the information
about "Will" and the gun purchase was made-up or not wholly derived
from Defendant's own words. While certain words or sentence
structures perhaps reveal "input" from Zincone (for example,

_____

[11] As the Government notes, Dr. Parsons' report reflects that
in 2008 the Defendant was able to understand Dr. Parsons' many
verbal questions and provide detailed responses with respect to
background and health information. The Court mentions this not as
a dispositive (or even critical) fact, but as an additional
consideration in examining Defendant's general ability to
comprehend and provide information.

"Replica" and ".38 revolver with 5 rounds") or shaping of Defendant's statement, the fact that Defendant preferred Zincone to write down his oral statement out of nervousness does not, without more, justify setting it aside. It would be preferable to have such a statement recorded or in the Defendant's own hand, without question. But without more, it cannot be said that such a statement written by a law enforcement officer is tainted and/or involuntary.

In short, there is, at most, the possibility that limited cognitive ability or health issues had some effect on Defendant on May 3, 2007. But when combined with his criminal history and the absolute dearth of proof of any coercive police activity, the preponderance of the evidence supports finding a deliberate waiver and knowing statement. See Garner v. Mitchell, 557 F.3d 257, 264-65 (6th Cir. 2009); Rice v. Cooper, 148 F.3d 747, 750 (7th Cir. 1998) (An admission is not deemed involuntary "merely because it would not have been made had the defendant not been mentally defective or deranged. The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers") (internal citation omitted).

III. Conclusion

   For the foregoing reasons, the Defendant's Motion to Suppress

Evidence and Motion to Suppress Statements are DENIED.

IT IS SO ORDERED.

_____

William E. Smith
United States District Judge
Date: 4/23/09